Good morning, Your Honors. Good morning. And I think I remember this case, so welcome back. Me too. It's the third time, I think. We had the next, we had the next, I was on the next. Oh, you were on the next. So you tried to get away from both of us. You had your first, yeah. So we had either of you on either of the two patients. On different iterations of this previously, so.  So we should have four. I'm apparently the only new one. It should be familiar on Lexis through Ohio access, I'm sure, Your Honor. I think I can be brief, because I think the issues here are straightforward. The big question is mootness. This case was tried in 2019, and the entire focus was on the NTC program. It's a specialized program that had a screening team that decided whether a patient should be allowed to go in for treatment with her dog. And the treatment team decided that plaintiff would be better off for clinical reasons not to have her dog present. When the case was remanded later, the trial court, Judge Carter, agreed with us that the fundamental alteration defense applied, that is that bringing her dog into treatment would fundamentally alter the clinical nature of the treatment. In the case. And then this court remanded for a mootness consideration because the NTC program closed in 2020. And so the whole issue now. And that didn't get raised in the second appeal, right? So the second appeal, I think, I mean, because I was looking back at this, like, did we miss something? But I don't think anybody told us that it had closed. It was in a footnote. Oh. And the court caught it and asked us to. In our panel or in a different panel? In the other panel. The second panel, which Judge Van Dyke would have been on that panel. Okay. And caught it, and it was in a footnote, and asked us to address the issue. And that's what got remanded back then. And that's what resulted in the remand. So why isn't this moot? You were saying it is moot or you're saying it's moot? I'm saying it's moot. Yeah. And the reason is that the NTC program is different than any other program at the hospital, number one. And number two, Plaintiff never applied and was never rejected for admission to any other program. And so you don't have a crystallized kind of controversy here that relates to these other programs. And they focus. Does that resolve the whole case? There's still, if I remember, there's still some other issues, though. Or does that just moot out the entire case? In our view, I think the case is moot. Okay. Because the case was tried on the theory that the NTC program was discriminatory under the ADA. And that was the sole issue. There was no testimony. There was no issue resolved as to any other program. And the reason for that is obvious. She had never applied to any other program. So I think this case should be. What about voluntary cessation? What about voluntary cessation? Your client stopped the program. We stopped the program. There was shortage of staff and patients. And so that was the thinking. They couldn't continue. It wasn't because they thought they were doing something wrong and, therefore, ceased. It's because they weren't making any money, if I remember. Yeah, if they weren't making any money. But that's the motivation. It's not a concession of wrongdoing on their part. In fact, they had prevailed in the district court on the fundamental alteration defense. So there was no reason other than the financial, staffing, medical necessities that caused the program to shut down. So I think that is the end of the case. If you were to send it back, I'm not sure what you would try at this point. The case is moot. It was tried on a very narrow set of circumstances. If she were to apply and be rejected to one of these other programs, then she would have a case. But that hasn't happened. It's hypothetical. It's speculative. The testimony on remand was that she would be allowed in these other programs to bring her dog. That's not an issue. The plaintiff is arguing that there was a stipulation that the parties entered into after remand in which Del Amo agreed that the programs, procedures, all that had not changed since 2014. From that, the trial court extrapolated that, therefore, if it didn't change, it must have been in violation of the ADA in the first place. But all the stipulation said was that it hadn't changed since 2014. There had been no change in policies and procedures. Our position is that they were never not compliant with the ADA because the only question was whether the NTC program was noncompliant because the position the hospital took was that, yes, as to any other program, she always would have been allowed to bring her dog in. So the fundamental alteration defense was exclusive to the NTC. As I recall, I got the impression that this was a program that was very, for lack of a better word, its whole structure and everything was based on this person that ran it, this doctor that ran it. And it was his view that it would not work. It would fundamentally alter if he included dogs. But then he passed away, is my understanding. And so the program kind of died with him because it was so tied up in him doing it. And so it makes some sense to me that if my understanding of all that is correct, it sounds like you agree with that. It was his baby. It was his baby and his program and including the policy that it just won't work if we try to let people bring their dog. And so he's gone. The program goes away because of him. I guess the question for voluntary cessation or for whether it's mood, I guess, how this fits with the doctor, I don't know. But the practical question seems to be what are the chances that this could come along. It's not going to come along through that fellow because he's unfortunately passed away. But I suppose somebody else could come. The hospital could hire somebody else and that person could have a similar view. We'll hear from your colleague on our side, but I think that would have to be their view, is that nothing prevents them from starting a program up again with a leader that has this view. And I just don't have a good feel for how many people out there. I mean, what are the odds of that happening? I don't know what the odds are. But I think the easiest answer to that question is that when you're talking about voluntary cessation, you have to assume that there was a preexisting violation or threatened violation. And that was defeated by the trial from courts finding that there was a fundamental alteration defense that prevailed. So, in other words, when you volunteer— That was never adjudicated. That was what was—isn't that what was in our appeal, in the second appeal, I think? And what happened is we looked at it and were like, well, wait a minute. We probably shouldn't address this fundamental alteration thing if the program is not even around anymore. And so we—as I recall, we kind of said, well, wait a minute. And I think in oral argument we were like, the program is not around anymore, right? And you guys were like, yeah, it's not around. And we were like, okay, so we—I remember the whole fundamental alteration was before us, but we kind of didn't decide it on that. It wasn't decided, but the state of the record was. Right, but I don't know that we can rely on something that we never—that was never sort of fully litigated as the basis for this case being moot because, you know, you didn't—I guess— but aside from that, aside from that, if it all kind of turned— like if there was a 90 percent chance that this program is coming back, the guy's son who does the program just like him just got hired by the hospital, then it seemed to me like it wouldn't be hard to say it's moot. But I don't think that's the case. I'm just trying to figure out, like, what is the chance that this comes back in this form with the same rules? Yeah, I think if it comes back, then we revert back to our defense that this kind of treatment would interfere or this kind of admission of a dog— It would have to start over again, I guess. It might have to start all over again, but in terms of a fundamental existing violation, there would be none. Either way, either the court never reached the issue of the legality of the fundamental alteration defense or it never happened because it's wiped clean. I take it your view is that it's completely speculative or hypothetical whether something like this could come back. There's nothing in the record or anything that would cause us to think that this is a one-of-a-kind program with its policy was very much based on its leader's view. The leader's passed away. The program's dried up and gone away. And there's no more chance of this type of program coming back at this hospital as opposed to any other hospital. It could happen, but we— It could happen, but it's speculative. And again, my point is you have to cease engaging in wrongful activity. And there's no predicted wrongful activity either because the district court concluded that the defense, our defense of fundamental alteration— Wait, you think voluntary cessation only applies if there's a final determination that the conduct is wrongful? There's got to be some determination. There's got to be some violation. It doesn't have to be a judicial determination, but there's got to be some violation, I would think. Yeah, I'm not sure that works. I think, again, like the idea that like you're basically saying the case is moot because we haven't done anything. We never did anything wrong. And it was never decided. I'm not sure that works, but the case could be moot because there's nothing going on anymore, and it's speculative that anything like this would happen. Right, and subjectively from the hospital's point of view, they've always felt they were doing the right thing. So that's what I'm reflecting is their position. Well, maybe we should hear from—I don't know if we want to keep going. Actually, I have one more question. I know you wanted just to take a couple minutes, but you're not asking us to do anything with the first opinion, but now I realize we sat on a case and we decided it that if we say this is moot, it would have been moot, you know, back when we heard it. Is there anything you're—you're not asking us to do anything with that, though? I'm not sure it would have been moot after the first appeal. It might have been— Well, I thought I went and looked at the timing because I thought that one came out in 21 and you ceased it in 20, but no one knew about it. Maybe we just looked the other way on this, and maybe there's nothing we can do anyway. I mean, if we realize that an opinion is moot five years later, I don't think we go back and pull it out. I frankly was just the appellate attorney, so I can't answer the question. Okay. I mean, if I had picked up on the fact that he— No, I understand. I'm not trying to— I would have brought it up. I'm just wondering if we need to do anything, and I think the answer is no. I take it your answer is you haven't really thought about it. I think nobody brought it up. It wasn't an issue. Okay. The decision is final. Yeah, yeah. No, I understand. I tend to agree. But I have the same curiosity you do, and I'd have to go back and look at the record to find out. Okay. Unless the Court has any further questions. What is it? No, we're fine. Thank you. Good morning, Your Honors. May it please the Court. Christopher Knopf for Plaintiff CL, who's the appellee and the prevailing party in this case. Welcome back. Welcome back, and welcome, Judge Cole. Thank you. I think we actually had a different—the other Judge Cole in one of the other ones as well, so I see the logic of the Court. Your Honors, you won't be surprised to hear that I have a very different view of this case and the facts and the questions that are at bar in this appeal than counsel. And you might want to go beyond mootness, but can we focus on mootness first? Absolutely. I mean, your view is—I mean, you agree that the program doesn't exist. That's not your different view of the facts, right? The NTC was one aspect of a hospital. This is a psychiatric hospital in Torrance that has multiple programs. Right, but your client was only going to the NTC. So, Your Honor, let's be careful here. Okay. We did not—in our complaint, we alleged that the hospital failed to accommodate our client's service dog, not the NTC. She—our client, as you know, is a Ph.D., very smart. She researched various hospitals to determine where she needed to go when she's in crisis.  Is she going to any—has she been to the hospital for any other program since NTC closed in 2020? No, she has not. Well, I don't understand your point. That's not the issue. No, it absolutely is the issue. Your Honor, if I may, if I may. The way that it works is the patient—and the record supports this fully. The patient arrives at the hospital and the intake folks determine what the person's needs are and then processes them accordingly. She had heard of the NTC. She has a lot of trauma from childhood. That's what attracted her there, along with it taking Medi-Cal and along with it being close to her home. This court—the district court properly analyzed mootness, Your Honor, because the whole question is whether— is there still any other relief that could be awarded? And the answer is yes, absolutely, because of the deterrence issue and the availability of other programs at the hospital. She was there for— Hold on. Okay, well, then we get into a— Yeah. Okay, so even—so your argument now is, well, let's get beyond mootness. But then you've got to outright this problem because, I mean, how—she hasn't even ever tried to go and been rejected anywhere else. Your Honor, that's not the issue. It's just not—no, Your Honor— She hasn't been to the hospital in five years. That is not—we are looking at clear error as to—at the time of trial when this case was decided. And the evidence at that time, Your Honor, was that there was a program at the hospital that was available. They call it the DELSOL program. Okay? That—it provides 24-hour care for folks in psychiatric crisis. That's what she was there for. NTC may have had a trauma basis. Because I want to find out the limits of your view of the white mootness. Would you—what is your view if the hospital had—was gone? Because it seems to me you're trying to distinguish between the program and the hospital. I understand. But if you're—would you agree or disagree that if the hospital was gone, like they just closed, something happened during COVID and they went out of business, that the case would be moot? Yeah. Okay. I think your view would be that, well, you would—the reason for that would be, I mean, in theory, the hospital could—they could build another hospital there. Same management—I mean, in theory, that could happen. But these really speculative things don't really count to overcome mootness, whether you characterize them as ripeness or whatever. And so what I'm trying to figure out is if you would agree with that, I think that's got to be right, there are things that moot cases. And one would be the hospital disappearing. Well, if the program disappears, and in addition to that, there's zero evidence whatsoever. In fact, the evidence in this case is that every other program, every other aspect of this hospital will allow her to bring her dog. And that's even if she wants to go there and she hasn't been there in five years. We have no idea whether she wants to. But it doesn't seem that different than the hospital—the program going away doesn't seem that different than the hospital having—because the program was the only thing that kept her from bringing her dog. Let me bring you back, and I can answer your Honor's question here, okay? The way the ADA works is that when she appeared with a service dog at the hospital, the hospital had a legal obligation to serve her if it could, okay? The initial—the initial— You said counsel. —steering to NTC was something that would happen in the very first instance that she went there. She then went there seven or eight times at various points when she was triggered, and the staff happened to know her. All to NTC, right? All to NTC. Because that's where she went the very first time. I know, but counsel, if she had said, you know what, I don't need NTC. It turned—I need to get my blood drawn. If she had known about Del Sol, she would have. Your Honor, the hospital never gave her an opportunity to say, if you really want your service dog, then we have this other program called Del Sol. It's not even a program. It's just a manner of treatment. The difference is that NTC had cognitive behavioral therapy multiple times a day. That's the only difference, Your Honor. Del Sol had therapy once or twice a day. Well, you say it's the only difference. There's also a very important key difference, which is you can't bring your dog to NTC, and you can't bring your dog to anything else at the hospital. So that's pretty important. And this gets to the issue. I understand what you—I think I understand your argument. Your argument is, listen, it is the hospital that did not let her bring her dog, and we should not get all caught up with the fact that it was related to this. There was another program that would have taken the dog. And under the ADA, they had to at least offer it. They had to talk about it. But then— If they had done that, she would have said yes. Counsel, now you're making a different argument. Now you're saying your whole basis is not that they violated the ADA by not letting her bring her dog into the NTC. You're now saying they didn't offer an alternative. Was that what was tried to the jury? I understood the jury was all based on you said I couldn't bring my dog to the NTC. Did you try to the jury that there was an alternative and it was not offered? There's no jury. It was a trial to the court, and the court on remand got evidence that they did not offer Del Sol. And CL's testimony, undisputed testimony, is they never advised her of that program. But wait, then the injunction you would want would be an injunction to fully explain to patients all of the options, including those that allow service. It wouldn't be an injunction to prevent them from bringing in a service dog. It would be an injunction to prevent them from failing to describe the other options, it sounds like, under this theory. That would be relief for the type of— Ideally, an injunction would include that. It is sufficient that this district court simply said, thou shalt not exclude a service dog. Because at this point, there is a program that will serve her. And that's the whole issue, Your Honor. This is prospective relief. That's the whole point. So she could go there and there's no problem. There is a problem. And the problem is the policy still requires certification of the service dog. That's still in the policy. The policy still states— So if you were asking for damages, I suppose this argument would make a little more sense to me. Because you would—we would say, well, what are her—I mean, and you hadn't waived it. We'd have to look into that. But then we'd say, what are your damages from them not offering her an alternative? But going back to moodiness, ripeness, if the basis was—and I don't understand you to be disputing this particular thing. I think you're saying it's irrelevant. But the basis for them saying can't bring your dog was because this program does not allow the dog. If that's their basis and that program no longer exists and there's no reason for us to think that they would do that, then I don't understand why you'd get an injunction. I mean, it seems like you're saying I want to get an injunction to get them to do what they're already willing to do. And we don't give injunctions for that. The only evidence that we have that they are—will take the service dog now is a nonbinding statement in deposition. That's all we have. When we have a policy that is still erroneous and still in place— Counsel, you know what the problem is? Your client in over five years has never walked in and asked them if they would allow that to happen. So why in the world are you asking us to get involved here? I'm not asking you to get involved. No, you absolutely are. You're asking us to decide an issue that is completely theoretical.  Deterrence is sufficient. She was deterred from—Your Honor, she was deterred from returning to the hospital. She was. Let's say I give you that. She was. Yes. And if you're asking for damages, we try to figure out whatever— But you also—but if you want injunctive relief, you have to convince us that there's a chance that that will happen again. And normally we'd say it happened and it passed out again. But there's a very significant event here that gets in the way of that. And you're just wanting us to ignore it because you're saying it was this hospital. But I don't think we can ignore that—I don't think we can ignore that the program no longer exists. And you're saying, well, there's no evidence. I guess you're saying there's no evidence that she wouldn't show up, that if she walked in there— Do you think that if she walked in there right now with her dog and— Is your argument that if she walked in there right now with her dog and said, I need to get treatment, that they would reject the dog? Your Honor, number one, she has an injunction in her hand right now. So based on that, she— But without the injunction, you— Without the injunction, the evidence is that there is high staff turnover. They are not trained on the service dog issue. Their intake procedure still requires certification of a service dog. How long has she had the injunction?  How long has she had the injunction? Since 2004. So what's been deterring her for the last year and a half? Well, Your Honor, the whole point of her returning is that it is—it's not speculative. She has PTSD, dissociative identity disorder. She's been going to therapy since she was a teenager. She sees a therapist once a week. Does she think that if she goes there, they won't let her—I mean, does she—because you've been told by their attorneys in this litigation that, hey, she can— Assuming there was no injunction, Your Honor, she absolutely would not go there because of what happened to her previously. She was not allowed to bring in her service dog. It was never adjudicated that it was a fundamental alteration, Your Honor. That issue is gone. Well, couldn't you as her attorney tell her, like, listen, they say that the—that was just that program, and if you go there now, I don't— Your Honor, what I would advise her to do as an attorney is a whole separate thing of whether the district court had a proper evidentiary record, properly applied Friends of the Earth, and Bayer, and the other legal issues at large. Counsel, you need to be a better attorney. You need to tell her the real truth, which is go there if you want to go there and see if you get rejected. Of course, Your Honor.  She has to take care of herself. That's not what I'm saying. Well, I don't know what you are saying. I'm saying that— I mean, you're saying she has an injunction in hand. Yes. And she still refuses to go there. That's not what I'm saying. You're misunderstanding, Your Honor. I apologize if I said that. I don't believe I said that. She has an injunction, which she would feel comfortable going there now because she knows— My point is she still hasn't. That's not the point of this appeal. The point of this appeal is whether the district court had a proper conclusion based on Friends of the Earth, on mootness. And the record at that time—you're asking about what's happened— If this injunction stays in place, what changes about the real world? Maybe try it that way. So assuming this injunction is not vacated— Yes. Or let's assume the converse. Assuming the injunction is vacated, what changes in the real world? What changes in the real world is that she then is deterred again from returning to Dalama. But it can't be that a party's sort of irrational belief about the way things are going to turn out informs whether or not something is moot, can it? That can't be right. The district court ruled that based on the testimony and the evidence in the case, which is what we are here talking about, is the evidence in the case at the time of the ruling was appropriate to conclude that she was properly deterred. It was based on the fact that they had a faulty policy—  From the NTC. The district court ruled that the rest of the hospital program was not accessible to her. You're focused on NTC because Dalama wants to focus on NTC and narrow it. It's not about that. It's about whether there was anything at the hospital where she could attend with her service dog. If they had said NTC does not work, but this other unit, this other room over here— If they had said that to her, we wouldn't be here today. We wouldn't be here today. Not until 2023. Whether they've said it or not, she's got an injunction. 2023, Your Honor. Okay. And has she gone back in the last two years? Your Honor, the point is she was not allowed to bring her dog. If they had said to her, yes, you can bring your dog to this— Okay. I need you to read the— Oh, we've read it. Okay. I mean, honestly, it's hard to make this case worse, and you did with this argument. I'm sorry. I mean, it's just shocking. Go tell her to go to the hospital if she wants to go there. There's been no prohibition in the last two years. I don't know what your game is here. It's not the standard. All right. Thanks. Yeah. Just briefly. This whole question about explaining the services. Can you help me out? Are we—am I losing my mind? Because I don't—I mean, you told them. Is that true that you told them in 2023 she could go to anywhere else in the hospital and they wouldn't have a problem with the service dog? I think it's in the declaration of Tina Clark, and the position is that the Del Sol program has always been open to her. That's in the record. That's in her entire deposition is there. So you're representing to the court if she walked in here anytime from 2023 at least, if she walked in there tomorrow, you're saying you're welcome, we will roll out the red carpet for you, we will give you any treatment, we will love you as we should any patient. That's your statement to the court. That's the stipulation. I just wanted to say that, you know, this addition of the Del Sol program and not explaining other programs to her, not only are they moving the goalposts, they want to play in a different football field. That's the problem. And that was not part of this case, not litigated at trial. It just belongs. I was given really good advice. When you've won, sit down. I appreciate it. I appreciate both of you, but stop. Stop. That's fine. Thank you, Your Honor. Thank you. All right. The case is now submitted and that concludes our arguments for the day. All rise. Hear ye. Hear ye. Officer Tuckingham business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this session. Now stand adjourned.
judges: NELSON, VANDYKE, Cole